JS 44 (Rev. 09/11)

12-cv-7065

# CIVIL COVER SHEET

The JS 44 civil coversheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States inSeptember 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
SCHUYLKILL HEALTH SYSTEM

**DEFENDANTS**
CARDINAL HEALTH, INC.
OWENS & MINOR, INC.,

12    7065

**(b)** County of Residence of First Listed Plaintiff   Schuylkill
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Franklin (Ohio)
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Kendall S. Zylstra, Richard D. Schwartz (Faruqi & Faruqi, LLP, 101
Greenwood Ave. Suite 600, Jenkintown PA 19046, 215.277.5770)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
     Plaintiff

☒ 3  Federal Question
     *(U.S. Government Not a Party)*

☐ 2  U.S. Government
     Defendant

☐ 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☒ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| (Excl. Veterans) | ☐ 345 Marine Product Liability | Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | Injury | ☐ 380 Other Personal Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 791 Empl. Ret. Inc. | | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | (Prisoner Petition) | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     another district
     *(specify)*

☐ 6 Multidistrict
     Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
15 U.S.C §§ 1, 2
Brief description of cause:
Action for damages sustained by Plaintiff due to violations of the Clayton and Sherman Acts

## VII. REQUESTED IN COMPLAINT:
☑ CHECK IF THIS IS A CLASS ACTION
   UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE  Hon. R. Rogers   DOCKET NUMBER  12-CV-2760 D. of Kansas

DATE
12/18/2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

DEC 18 2012

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 420 South Jackson Street Pottsville, PA 17901

Address of Defendant: 7000 Cardinal Place, Dublin Ohio 43017

**12 7065**

Place of Accident, Incident or Transaction: 420 South Jackson Street Pottsville, PA 17901

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a)) Yes☐ No☒

Does this case involve multidistrict litigation possibilities? Yes☐ No☒

*RELATED CASE, IF ANY:*

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐ No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐ No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐ No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐ No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases*:

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☑ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases*:

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

**ARBITRATION CERTIFICATION**

*(Check Appropriate Category)*

I, Kendall S. Zylstra , counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: 12/18/2012           Kendall S. Zylstra           64006
                           Attorney-at-Law              Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 12/18/2012           Kendall S. Zylstra           64006          DEC 18 2012
                           Attorney-at-Law              Attorney I.D.#

CIV. 609 (5/2012)



**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

SCHUYLKILL HEALTH SYSTEM, on
behalf of itself and all others similarly
situated,

                Plaintiff,

                v.

CARDINAL HEALTH, INC. and
OWENS & MINOR, INC.,

                Defendant.

CIVIL ACTION
NO:

**12    7065**

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS           ( )

a)  Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.    ( )

b)  Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.    ( )

c)  Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

d)  Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.    ( )

e)  Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by the
    court. (See reverse side of this form for a detailed explanation of special
    management cases.)    (✓)

f)  Standard Management – Cases that do not fall into any one of the other tracks.    ( )

| 12/18/12 | Kendall S. Zylstra | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 277- 5770 | (215) 277- 5771 | Kzylstra@faruqilaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

DEC 1 8 2012

**JS**

$350

Kendall S. Zylstra
kzylstra@faruqilaw.com
Richard D. Schwartz
rschwartz@faruqilaw.com
FARUQI & FARUQI, LLP
101 Greenwood Avenue Suite 600
Jenkintown, PA 19046
Tel: (215) 577-5770
Fax: (215) 577-5771



FILED
DEC 18 2012
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| SCHUYLKILL HEALTH SYSTEM, on behalf of itself and all others similarly situated, | CIVIL ACTION NO. **12   7065** |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | <u>JURY TRIAL DEMANDED</u> |
| CARDINAL HEALTH, INC. and OWENS & MINOR, INC., | |
| Defendants. | |

Plaintiff alleges as follows based upon personal knowledge as to matters relating to itself, and upon information and belief as to all other matters:

### <u>JURISDICTION AND VENUE</u>

1.      Plaintiff Schuylkill Health System ("Plaintiff") brings this action against defendants Cardinal Health, Inc. ("Cardinal") and Owens & Minor, Inc. ("O&M") (collectively, "Defendants") pursuant to section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for

1

Defendants' violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).

2.      Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22 because Defendants are found or transact business in this District and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391.

## NATURE OF THE ACTION

3.      Plaintiff is a Pennsylvania non-profit corporation that operates two acute care hospitals in Pottsville, Pennsylvania. Plaintiff buys sutures and endomechanical ("endo") products directly from one or more of the Defendants. Plaintiff brings this class action on behalf of itself and all other similarly situated direct purchasers of sutures and endo products from Defendants, challenging exclusionary and anticompetitive conduct by the Defendants.

4.      Through the exclusionary and anticompetitive conduct alleged herein and described below, at all relevant times, Defendants have unlawfully maintained dominance in the U.S. markets for sutures and endo products, and thereby artificially inflated prices to Plaintiff and members of the proposed class. Defendants' anticompetitive scheme to monopolize involves unlawful means including, *inter alia*, a scheme to enforce exclusionary provisions of its distribution contracts to impede the ability of Plaintiff and members of the class to buy sutures and endo products from Defendants' competitors. These exclusionary contracts have impeded the ability of acute care providers to buy sutures and endo products from Defendants' competitors because these contracts require purchasers to incur substantial price penalties if they buy even small quantities of any sutures and endo products from Defendants' competitors. The scheme injures purchasers by suppressing competition, preventing entry and expansion by rivals,

2

imposing supracompetitive prices, and stifling innovation.   As a result of Defendants'
anticompetitive scheme, Plaintiff has directly paid Defendants overcharges for sutures and endo
products.

## PARTIES

5.     Plaintiff Schuylkill Health System is a Pennsylvania non-profit corporation with
its principal place of business at 420 S Jackson Street, Pottsville, Pennsylvania 17901.  Plaintiff
operates multiple acute care hospitals.  During the Class Period (defined below), Plaintiff
purchased sutures and endo products directly from one or more of the Defendants and was
damaged as a result of Defendants' unlawful conduct.

6.     Defendant Cardinal, formed in 1979, is a corporation organized and existing
under the laws of the State of Ohio with its principal place of business at 7000 Cardinal Place,
Dublin, Ohio 43017.  Cardinal's common stock is traded on the New York Stock Exchange
under the symbol "CAH."

7.     Cardinal's Medical segment develops, manufactures, sources and distributes
medical, surgical and laboratory products including sutures and endo products.  Cardinal's
Medical segment operates over 50 medical-surgical distribution, assembly, manufacturing and
research facilities.  Cardinal serves customers in this District from a distribution center in
Swedesboro, New Jersey.  According to Cardinal's most recent Annual Report, its Medical
segment realized revenues in 2012 of over $9.6 billion.

8.     Defendant O&M, founded in 1882, is a corporation organized and existing under
the laws of Virginia, with its principal place of business at 9120 Lockwood Boulevard,
Mechanicsville, Virginia 23116.  O&M's common stock is traded on the New York Stock

3

Exchange under the symbol "OMI." O&M serves customers in this District from a distribution center in Allentown, Pennsylvania.

9.     As stated in its most recent Annual Report, O&M's "core" business is the "distribution of finished medical and surgical products." O&M reported net revenue of over $8.6 billion for 2011.

## INTERSTATE TRADE AND COMMERCE

10.     The sutures and endomechanical products at issue in this action are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

11.     During all of the Class Period, Defendants transmitted funds, contracts, invoices, and/or other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the relevant market.

## FACTUAL BACKGROUND

### *Medical and Surgical Supply Distribution*

12.     Defendants O&M and Cardinal are the nation's largest distributors of Medical and Surgical ("Med-Surg") products to acute care providers. O&M has a market share of 39 percent. Cardinal has an estimated 33 percent market share; collectively, Defendants control 72 percent of the distribution market. Upon information and belief, Defendants possess similar shares in the distribution of sutures and endo products to acute care providers. Individually, and in unison, Defendants hold dominant market positions.

13.     Distributors of Med-Surg products acquire the products at bulk prices directly from manufacturers. Distributors take possession of the Med-Surg products and then resell the products to end-users through proprietary distribution networks and distribution centers.

4

14.     Acute care providers, like Plaintiff, require a wide range of Med-Surg products and procure Med-Surg products from one or more distributors rather than enter into costly and time-consuming arrangements with individual manufacturers.

15.     Annually, acute care providers purchase approximately $22 billion worth of Med-Surg products.

16.     Over 88 percent of the volume sold by Med-Surg distributors comes from thirty product categories.

17.     The domestic distribution of Med-Surg products to acute care providers (exclusive of sutures and endo products) constitutes a relevant market. At all relevant times, Defendants had monopoly power in the market for distribution of Med-Surg products (exclusive of sutures and endo products) to acute care providers.

18.     Free from anticompetitive contracts and agreements, distributors would compete with each other to serve the Med-Surg product needs of acute care providers.

### *Sutures and Endomechanical Products*

19.     Sutures and endo products are two categories of Med-Surg products.

20.     Sutures are medical devices that hold body tissues together after surgery or injury.

21.     Endo products are devices used in minimally invasive surgeries such as laparascopic surgery.

22.     According to data compiled by the Health Industry Distributors Association (HIDA), sutures and endo products make up approximately 10% of the Med-Surg products sold and distributed each year to acute care providers. The value of the distributed sutures and endo products is over $2 billion annually.

5

23.     Acute care providers require a variety of sutures and endo products because many
sutures and endo products are specific to particular medical and surgical applications. Different
types of wounds, for example, require different types of sutures. Additionally, individual
medical practitioners have individual preferences among particular sutures and endo products.

24.     Since acute care providers require a broad range of sutures and endo products, all
else equal, acute care providers prefer distributors that reliably offer a large selection at a low
price.

25.     Since 1998, a distributor named Sutures Express, Inc. ("Suture Express") has
competed against O&M and Cardinal by focusing on sutures and endo products. Suture Express
is a national Med-Surg distributor to acute care providers specializing in two Med-Surg product
categories – sutures and endo products. By specializing, Suture Express is able to offer acute
care providers superior service, lower distribution fees, faster and more efficient delivery and
more comprehensive product line.

26.     Entry by a distributor along one or two product lines is more feasible than entry
across all Med-Surg products. Defendants' scheme is aimed at forcing entrants to compete
simultaneously across all Med-Surg products, which raises the competitors' costs.

27.     From 1998 through 2008, Suture Express experienced significant growth in
revenues and profitability by competing with Defendants to meet the suture and endo product
needs of acute care providers.

28.     Suture Express succeeded by distinguishing itself from Defendants by offering a
superior distribution service that includes (1) the largest selection of sutures and endo products;
(2) superior delivery service; (3) lower distribution fees; (4) higher order fill rates; and (5) no
additional handling or restocking fees.

6

29. It was only after Suture Express' entry into the sutures and endo products markets that Defendants implemented their exclusionary and anticompetitive scheme. The scheme reduced Suture Express' market share.

## RELEVANT MARKET AND MONOPOLY POWER

30. To the extent that Plaintiff is legally required to prove monopoly power circumstantially by first defining a relevant product market, Plaintiff alleges that three product markets are potentially relevant to Plaintiff's antitrust claims: (1) distribution of Med-Surg products (exclusive of sutures and endo products) to acute care providers; (2) distribution of sutures to acute care providers; and (3) distribution of endo products to acute care providers.

31. Defendants have monopoly power in the market for distribution of Med-Surg products (exclusive of sutures and endo products) to acute care providers and the markets for distribution of sutures and endo products.

32. The relevant geographic market is the United States. Distributors Med-Surg products distribute the products throughout the United States. Med-Surg products are priced by distributors on a national level.

33. There are no reasonably interchangeable substitutes for sutures and endo products. Accordingly, sutures and endo products do not exhibit significant, positive cross-elasticity of demand with respect to price, with any other products.

34. At all relevant times, Defendants have been able to profitably charge supracompetitive prices for sutures and endo products, without losing substantial sales, due to their monopoly power and exclusionary conduct.

7

35.    Defendants could sustain a small but significant, non-transitory price increase above competitive levels on its sutures and endo products without causing so significant loss of sales as to make that artificial price inflation unprofitable.

36.    In each of the aforementioned product markets, barriers to entry – including high fixed costs, high risk of failure in the business development process, and difficult regulatory hurdles – render the entry of new competitors difficult. Med-Surg product distribution requires substantial investment in a distribution network and regulatory compliance. Thus, there are very rarely new Med-Surg distributors.

37.    Acute care providers need to buy a wide variety of sutures and endo products. The majority of acute care providers do this by contracting with Defendants. A minority of acute care provider purchasers use Sutures Express as their primary sutures and endo products. Purchasers are increasingly unable to use Sutures Express as a primary supplier of sutures and endo products because: (1) there are exclusive contracts between acute care providers and Defendants; and (2) Defendants have acted in concert to implement similar exclusionary contracts.

38.    There are very few distributors of sutures and endo products in the United States. Other than Defendants, distributors of sutures and endo products are relegated to a small share of the market in large part because of the conduct alleged herein and below.

39.    Defendants have used (and continue to use) their monopoly power and collusion with respect to sutures and endo products to artificially preserve monopoly power in the relevant markets. Defendants have maintained supracompetitive prices for sutures and endo products since other distributors have entered, or attempted to enter, the markets.

8

## DEFENDANTS' ANTICOMPETITIVE CONDUCT

40.     As discussed above, the distribution of Med-Surg products such as sutures and endo products is characterized by high fixed costs for entry, risk of failure, and regulatory hurdles.

41.     Over 88 percent of the volume sold by Med-Surg distributors comes from thirty product categories, but the exclusionary and anticompetitive behavior at issue asserted by Plaintiff applies to two Med-Surg product categories: sutures and endo products.

42.     Faced with competition from a distributor like Suture Express that offered customers superior pricing and service, Defendants deployed exclusionary and anticompetitive practices leveraging their power in the distribution of Med-Surg products other than sutures and endo products.  Defendants have entered into exclusionary contracts with acute care providers that penalize acute care providers that purchase sutures and endo products from rivals.

43.     Defendants' anticompetitive practices began no later than 2008.

44.     Defendants' exclusionary scheme also involves Defendants' efforts to enforce the exclusionary provisions of its contracts in order to punish buyers who defect to purchase even small quantities of sutures and endo products from Defendants' rivals.

45.     Defendants have entered into exclusionary contracts with a majority of acute care providers, covering a majority of private sector purchasers, which contracts penalize the acute care providers for buying sutures and endo products from Defendants' rivals.

46.     Defendants unlawfully bundle the sale of sutures and endo products to the sale of other Med-Surg products.  Defendants' distribution contracts provide that if an acute care provider wants to purchase Med-Surg products excluding sutures and endo products, the customer will be forced to pay a penalty in the form of a distribution fee.

9

47.     An acute care provider that does not purchase its sutures and endo product

requirements from Defendants is forced to pay a penalty on the full range of Med-Surg products

purchased from Defendants.  The penalty ranges from 1 percent to 5 percent of the price of the

full range of Med-Surg products.

48.     The penalty is economically prohibitive because the savings an acute care

provider realizes by purchasing sutures and endo products from Defendants' rival are

overwhelmed by the penalty the acute care provider must pay on all other Med-Surg products.

49.     Defendants are aware that this bundling blocks Suture Express' ability to compete

fairly because, through the bundled pricing, a purchaser who buys from Suture Express not only

pays a steep price penalty on all of the sutures and endo products that that purchaser buys, but

also pays a penalty price to Defendants on scores of *unrelated* Med-Surg products.  Since Suture

Express specializes in sutures and endo products, there is no way that Suture Express

can compensate an acute care provider to make up for Defendants' price penalties on these other

Med-Surg products.

50.     To employ their scheme, Defendants monitor acute care providers' purchases.

51.     Thus, if an acute care provider bought more than 10% of its requirements for

sutures and endo products then it would pay a stiff penalty on all of the Med-Surg products in

Defendants' bundle.  In effect, through the bundled pricing scheme, Defendants are able to raise

the price for purchasers of buying their competitor's sutures and endo products.

52.     Defendants often conceal the exclusionary penalty scheme as a discount program.

Defendants market a bundle of Med-Surg products that include sutures and endo products with a

so-called discounted distribution fee.  The discount is lost when a customer removes sutures and

endo products from the bundle.

10

53. The contracts do not exempt purchases from distributors that do not offer a full line of Med-Surg products from discount calculations.

54. Defendants have leveraged their size, monopoly power, market dominance, and the breadth of their product lines to impose anticompetitive agreements upon acute care providers. The exclusionary scheme has substantially foreclosed competitors from increasing their market shares and has blocked new entry into or expansion in the relevant markets.

55. The exclusionary and anticompetitive schemes employed by Defendants are strikingly similar to each other and functionally identical.

56. Defendants have employed their scheme in unison and at or about the same time the effect of which is that Defendants do not compete with each other for sales of sutures and endo products. If either Defendant wanted to compete to gain market share, it could remove the bundling penalties in its agreements with acute care providers.

57. The Defendants' unified front against distributors that focus on sutures and endo products defies the logic of independent economic actors. For example, following Cardinal's imposition of contractual penalties against acute care providers that "break the bundle" and purchase sutures and endo products from a rival distributor, if O&M was acting independently, it would offer the products without penalty to increase its market share. Instead, O&M offers the same contractual terms as its supposed competitor, Cardinal.

58. The Med-Surg distribution industry is highly concentrated between Cardinal and O&M. A high degree of concentration facilitates the operation of an agreement in restraint of trade or to allocate markets because an agreement with fewer participants is easier to coordinate.

59. Any purported legitimate business justifications for Defendants' anticompetitive practices are mere pretexts.

11

## DEFENDANTS HAVE WILLFULLY MAINTAINED AND EXPANDED THEIR MONOPOLY POWER IN THE SUTURES AND ENDO PRODUCTS MARKETS THROUGH THE USE OF AN ANTICOMPETITIVE EXCLUSIONARY CONTRACTING SCHEME

60.     The exclusionary penalties, discounts and contracts that Defendants have imposed have had the purpose and effect of foreclosing actual or potential competitors' ability to compete fairly in the sutures and endo products markets. It does so by making equally efficient rival distributors in the tied markets operate below costs to keep acute care providers who "break the bundle" whole. Defendants' exclusionary scheme requires Plaintiff and the proposed class members to buy Defendants' sutures and endo products to the near total exclusion of Defendants' competitors.

61.     Defendants' scheme has made the cost of buying sutures and endo products from Sutures Express prohibitively expensive to a great deal of acute care providers, and has thereby made it impossible, or nearly so, for Sutures Express and other actual or potential competitors to compete fairly for market share. Defendants' scheme has thereby excluded and unreasonably impaired Defendants' actual and potential sutures and endo products rivals.

62.     The healthcare industry is under substantial pressure to impose cost containment. Accordingly, penalty distributions fees can effectively prohibit customer choice in the markets for sutures and endo products.

63.     Defendants have been able to maintain their market share and monopoly power in the markets for sutures and endo products.

64.     Rival distributors have no efficient or reasonably effective means of combating Defendants' anticompetitive and exclusionary conduct.

65.     The overall effect of Defendants' anticompetitive and exclusionary scheme has been to substantially foreclose and impair competition (and the threat of such competition) from

12

lower-priced and/or superior quality distribution of sutures and endo products. Defendants have monopoly power in the market for distribution of Med-Surg products. Defendants have used the pricing and supply of the full range of Med-Surg products to preserve and extend their monopoly power in the markets for sutures and endo products.

66. As a result of Defendants' exclusionary contracting scheme, the aggregate penalty that a purchaser pays for buying from Sutures Express is so large that if that purchaser subtracts that penalty form the price of the sutures and endo products, the resulting price would be below Suture Express' average variable costs. An equally efficient distributor of sutures and endo products would have to distribute sutures and endo products at a loss due to Defendants' scheme. This is because equally efficient (or superior) competitors to Defendants need to compensate the buyer for all the penalties that the buyer would incur (on multiple Med-Surg products) for breaking Defendants' exclusivity and buying that rival's sutures and endo products. Because the scheme raises rivals' costs, Defendants may charge higher prices than they could without the scheme. And to the extent the scheme prevents single- or dual-product distribution rivals such as Suture Express from evolving into full-line distribution competitors, the scheme likely inflates the prices of all Med-Surg products.

67. The penalty price imposed on the distribution of Med-Surg products other than sutures and endo products exceeds the price that would be charged by a monopoly provider of such services.

68. As a result of Defendants' anticompetitive and exclusionary scheme, Defendants have had a direct and substantial adverse effect on competition by enhancing their monopoly power in the market for sutures and endo products, artificially creating barriers to entry in the relevant markets, foreclosing competition, and stifling innovation.

13

69.     Absent Defendants' exclusionary and anticompetitive conduct, Defendants' rival

Suture Express would be able to sell sutures and endo products for less than acute care providers,

such as Plaintiff, presently pays to one or more of the Defendants.

70.     Absent Defendants' exclusionary and anticompetitive conduct, barriers to entry to

the sutures and endo products markets would have been lower, which would have made it easier

for existing or new competitors to enter or expand their positions in the markets.

71.     Defendants' abuses of their monopoly power have harmed Plaintiff and other

direct purchasers by causing them to pay prices for sutures and endo products that have been and

continue to be higher than the prices that would have prevailed in a competitive market.

72.     The presence of unfettered competition from Sutures Express and/or other actual

or potential competitors would have forced Defendants to lower the price of sutures and endo

products to remain competitive and/or to counter a perceived risk of additional entry. Moreover,

customers would have been able to purchase sutures and endo products from Defendants'

competitors at a lower price.

73.     Thus, Plaintiff and similarly situated direct purchasers that purchased sutures and

endo products directly from Defendants have been overcharged due to Defendants' scheme.

## CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action on behalf of itself and all others similarly situated

pursuant to Rule 23 of the Federal Rules of Civil Procedure as representatives of a class (the

"Class") defined as follows:

> All persons or entities in the United States and its territories that
> purchased sutures and endo products from O&M and/or Cardinal
> or any of Defendants' divisions, subsidiaries, predecessors, or
> affiliates during the period from December 18, 2008 through such
> time as the effects of Defendants' illegal conduct have ceased ("the
> Class Period"), and excluding federal government entities,

14

Defendants, and Defendants' divisions, subsidiaries, predecessors, and affiliates.

75.     On information and belief, hundreds or thousands of entities in the United States have purchased sutures and endo products directly from Defendants. Thus, the Class is so numerous that joinder is impracticable.

76.     Plaintiff's claims are typical of those of the Class.

77.     Plaintiff and all members of the Class were injured in the form of overcharges by the same conduct of the Defendant.

78.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are not antagonistic to the Class.

79.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

80.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Defendants' exclusionary and anticompetitive conduct in monopolizing and attempting to monopolize the sutures and endo products markets, as more fully alleged herein.

81.     Questions of law and fact common to the Class include:

   a.   Whether Defendants intentionally and unlawfully impaired or impeded competitors in the sutures and endo product markets;

   b.   Whether Defendants possessed monopoly power in the distribution of Med-Surg products (exclusive of sutures and endo products);

15

c.  whether Defendants maintained or enhanced their monopoly power in the
    sutures and endo product markets;

d.  whether Defendants engaged in anticompetitive conduct in order to
    unlawfully disadvantage their competitors and maintain their monopoly
    power in the sutures and endo products markets;

e.  whether the geographic market for sutures and endo products is the United
    States;

f.  whether the relevant markets applicable to this case are the distribution of
    Med-Surg products (exclusive of sutures and end) to acute care providers;
    the distribution of sutures to acute care providers; and the distribution of
    endo products to acute care providers;

g.  whether Defendants' scheme caused an equally efficient rival to price its
    distribution service for sutures and endo products below its costs to make
    an acute care provider whole;

h.  whether Defendants had procompetitive reasons for their conduct, and
    whether the procompetitive effects of their conduct, if any, outweigh any
    anticompetitive effects;

i.  the effects of Defendants' maintenance or enhancement of monopoly
    power on prices of sutures and endo products;

j.  whether Plaintiff and other members of the Class have been overcharged
    and thus damaged by paying artificially inflated prices for sutures and
    endo products as a result of Defendants' unlawful behavior; and

k.  the proper measure of damages.

16

82.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

83.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action as a class action.

### FIRST CAUSE OF ACTION
### Monopolization of the
### Sutures and Endo Product Market (15 U.S.C. § 2)

84.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 83 above.

85.     At all relevant times, Defendants have had monopoly power in the sutures and endo product market.

86.     Defendants have possessed monopoly power in the distribution of Med-Surg products (exclusive of suture and endo products) to acute care providers, and they willfully maintained their monopoly power in the sutures and endo product market through exclusionary and anticompetitive means.  As described in more detail above, Defendants imposed exclusive contractual terms that are difficult to terminate on purchasers of sutures and endo products that severely penalized customers from buying more than a modest amount of sutures and endo products from rivals.  At least since 2008, Defendants' exclusionary contracts have unfairly

17

impaired the ability of rivals like Sutures Express to compete for market share, and thereby preserved Defendants' monopoly power in sutures and endo product market. By engaging in this conduct, Defendants have gained an artificial competitive advantage from its monopoly power and broad list of product offerings, instead of its lower price or superior quality, and unfairly impeded and impaired competitors in sutures and endo product market. The purpose and effect of Defendants' conduct have been to suppress rather than promote competition on the merits.

87.     By suppressing competition and maintaining monopoly power, Defendants were able to artificially inflate the price of sutures and endo products above levels that would have been obtained in a world in which Defendants did not engage in the anticompetitive conduct alleged herein. Instead of lowering prices to meet a new rival, Defendants' anticompetitive and exclusionary conduct allowed it to sell sutures and endo products at supracompetitive prices. Accordingly, the challenged conduct caused Plaintiff and members of the proposed class to pay artificially inflated prices for sutures and endo products.

88.     There is no procompetitive justification for Defendants' conduct.

89.     Plaintiff has been injured in its businesses and property by reason of Defendants' unlawful monopolization. Plaintiff's injury consists of paying higher prices to purchase the relevant products than it would have paid absent Defendants' conduct. Plaintiff's injury is of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

## SECOND CAUSE OF ACTION
### Anticompetitive Agreements in Restraint of Trade (15 U.S.C. § 1)

90.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 89 above.

18

91.     As set forth above, Defendants have used the size and breadth of product categories and monopoly power in the distribution of other MedSurg products, to preserve and extend their market share in the sutures and endo product markets.  Defendants entered into agreements that included written exclusionary non-easily terminable agreements in unreasonable restraint of trade, which included various exclusionary contractual terms.  Defendants have enforced these exclusionary agreements by imposing penalties.

92.     In particular, because of Defendants' scheme an equally efficient competitor would have to sell rival sutures and endo products at a loss to compete with Defendants' products.

93.     As alleged above, there was no legitimate business justification for these agreements and these agreements: (a) substantially foreclosed and excluded competition from other relevant sutures and endo products distributors; and (b) resulted in Defendants' willful maintenance and unlawful exercise of market power in the relevant markets.

94.     At all relevant times, Defendants' exclusionary agreements assisted Defendants' in: (a) effectively excluding less expensive, superior competitive products from the relevant markets; (b) maintaining Defendants' dominant market share and monopoly power in the relevant markets; (c) maintaining prices at artificially high levels for sutures and endo products; and (d) otherwise reaping the benefits of its illegal monopoly power.

95.     There is no procompetitive justification for Defendants' conduct.

96.     Plaintiff has been injured in its businesses and property by reason of the alleged agreements in restraint of trade, which facilitated, enabled, assisted, and furthered Defendants' substantial foreclosure and exclusion or impairment of competition and enhancement of monopoly power in the relevant markets.  Plaintiff's injury consists of paying higher prices to

19

purchase the relevant products than it would have paid absent Defendants' unlawful conduct. Plaintiff's injury is the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

### THIRD CAUSE OF ACTION
### Conspiracy to Restrain Trade (15 U.S.C. § 1)

97.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 96 above.

98.     Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

99.     The conspiracy consists of an agreement, understanding and/or concerted action between and among Defendants to allocate markets and/or employ functionally identical contractual terms that prevent their acute care provider customers from being able to purchase sutures and endo products from Defendants' rivals.  This conduct defies each individual Defendant's independent economic interest.

100.    As a proximate result of Defendants' anticompetitive conduct, Plaintiff and the Class have suffered injury in that they have paid supra-competitive prices for sutures and endo products during the Class Period.

### PETITION FOR RELIEF

WHEREFORE, Plaintiff petitions that:

a.   The Court determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be appointed class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

b.  The conduct alleged herein be declared, adjudged, and/or decreed to be unlawful under Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

c.  Plaintiff and the Class recover their overcharge damages, trebled, and the costs of the suit, including reasonable attorneys' fees as provided by law; and,

d.  Plaintiff and the Class be granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: December 18, 2012

FARUQI & FARUQI, LLP

By: _____
Kendall S. Zylstra

Kendall S. Zylstra
kzylstra@faruqilaw.com
Richard D. Schwartz
rschwartz@faruqilaw.com
FARUQI & FARUQI, LLP
101 Greenwood Avenue Suite 600
Jenkintown, PA 19046
Tel: (215) 577-5770
Fax: (215) 577-5771