IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCHUYLKILL HEALTH SYSTEM, | : | CIVIL ACTION |
| *on behalf of itself and all others similarly* | : | |
| *situated* | : | No. 12-7065 |
| | : | |
| v. | : | |
| | : | |
| CARDINAL HEALTH 200, LLC, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                     **July 30, 2014**

Plaintiff Schuylkill Health System (SHS) brings this putative antitrust class action against
Defendants Cardinal Health 200, LLC (Cardinal) and Owens & Minor Distribution, Inc. (O&M),
alleging violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and § 3 of the Clayton
Act, 15 U.S.C. § 14.[1] Defendants have filed a motion to dismiss challenging SHS's standing and
asserting SHS has failed to state a claim upon which relief may be granted. For the reasons set
forth below, this motion will be granted in part and denied in part.

## BACKGROUND

SHS is a nonprofit corporation that operates two acute care hospitals in Pottsville,
Pennsylvania. Defendants are the nation's largest sellers of distribution services for medical and
surgical (med-surg) products to hospitals and other acute care providers. There are thirty main
categories of med-surg products, two of which are sutures and endomechanical products (endo or

---

[1] On December 13, 2013, Defendants Cardinal Health, Inc. and Owens & Minor, Inc. were
dismissed by stipulation of the parties.

endo products).[2] SHS is a customer of Defendants for the distribution of sutures and endo products. According to the Amended Complaint, within the market for all med-surg products, including sutures and endo products, O&M has a market share of 39% and Cardinal has a market share of 33%, for a total of 72% between the two companies. SHS alleges, based on information and belief, that Defendants have similar market shares within the sutures and endo distribution services market. Am Compl. ¶ 17.

SHS claim Defendants engaged in unlawful, anticompetitive conduct that stifled competition in the sutures and endo distribution market, causing all of Defendants' hospital and acute care provider customers, including SHS, to be overcharged for products necessary to treat their patients. SHS asserts there are very few suture and endo product or med-surg product distributors operating in the United States, and other than Defendants, distributors of sutures and endo products are relegated to a small share of the market in large part because of Defendants' anticompetitive conduct. As an example, Suture Express (SE), a national med-surg distributor which sells only sutures and endo products, has been prevented from competing effectively, and SHS has been injured as a result. SHS alleges that from 1998 to 2008, SE experienced significant growth in revenues and profitability in the suture and endo distribution services market because it could offer superior service, lower distribution prices, and faster delivery since it focused only on sutures and endo products. SHS claims that beginning in 2008, and in response to SE's success, Defendants imposed contractual terms designed to punish customers who purchased sutures and endo products from SE by charging steep penalty prices on twenty-eight other product lines that SE did not sell. If an acute care provider bought more than 10% of its

---

[2] Sutures are medical devices that hold body tissues together after surgery or injury, and endo products are devices used in minimally invasive surgeries like laparoscopic surgery. Sutures and endo products make up approximately 10% of the med-surg products sold and distributed each year to acute care providers.

requirements for sutures and endo from a competitor of Defendants, it was forced to pay a distribution services penalty on all of the med-surg products in its order, or "bundle," with the Defendants. Because the aggregate penalty exceeded the cost for sutures and endo products, a rival, such as SE, with a less diverse product line could not price its products so as to offset the penalty, even if the rival gave away the products for free. According to SHS, this penalty is packaged as a "discount program."[3] As a result, SE has been foreclosed from a significant portion of the sutures and endo product distribution market, and all of Defendants' customers— whether or not their own contracts with the Defendants provided for such penalties—pay more for sutures and endo products than they would have paid in a market featuring competition from SE.

SHS also asserts Defendants have agreed to not compete with each other in the sutures and endo distribution services market. They employed their penalty schemes in unison, and these schemes are strikingly similar and functionally identical. In addition, Defendants are both members of the Health Industry Distributors Association (HIDA), a trade association representing medical product distributors. Every year HIDA hosts a number of annual conferences, including the Streamlining Healthcare Conference (f/k/a MedSurg Conference and Expo). SHS asserts representatives from both Defendants attend this conference every year, providing opportunities for Defendants to conspire.

SHS's Amended Complaint contains six counts: monopolization of the sutures and endo product market, in violation of 15 U.S.C. § 2 (Count One); anticompetitive agreements/bundling in restraint of trade, in violation of 15 U.S.C. § 1 (Count Two); conspiracy to restrain trade, in

---

[3] Whether this program is a discount or a penalty is not material to the Court's decision on the present motion to dismiss, so for purposes of this Memorandum, the Court will refer to the program as a "discount."

violation of 15 U.S.C. § 1 (Count Three); conspiracy to monopolize, in violation of 15 U.S.C. § 2 (Count Four); exclusive dealing, in violation of 15 U.S.C. § 14 (Count Five); and illegal tying of suture and endo distribution services, in violation of 15 U.S.C. § 1 (Count Six).[4]

On September 26, 2013, this Court denied Defendants' motion to transfer venue to the District of Kansas, the venue of an earlier-filed action against Defendants. On December 13, 2013, Defendants filed a joint motion to dismiss SHS's Amended Complaint for lack of standing and failure to state a claim upon which relief may be granted.

**DISCUSSION**

### A. PLEADING STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint when it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Because of the burdens discovery imposes on defendants in antitrust cases, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009); *see also Papasan v. Allain*, 478 U.S.

---

[4] SHS brings this action on behalf of itself and all others similarly situated, as representative of a class defined as:

> Acute care providers in the United States and its territories that purchased sutures and endo distribution services from O&M and/or Cardinal or any of Defendants' divisions, subsidiaries, predecessors, or affiliates during the period from December 18, 2008 through such time as the effects of Defendants' illegal conduct have ceased (the "Class Period"), and excluding federal government entities, Defendants, and Defendants' divisions, subsidiaries, predecessors, and affiliates.

Am. Compl. ¶ 99.

265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation."). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

In order to establish an actionable antitrust violation, a plaintiff must plead a basis for both Article III and antitrust standing. Article III of the United States Constitution confines the federal courts to the adjudication of actual cases and controversies. To establish Article III standing, a plaintiff must allege "(1) an injury that is (2) 'fairly traceable to the defendant's allegedly unlawful conduct' and that is (3) 'likely to be redressed by the requested relief.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). With regard to injury, "[a] legally and judicially cognizable injury-in-fact must be distinct and palpable, not abstract or conjectural or hypothetical." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005) (citation and internal quotation marks omitted). Injury-in-fact has no specific formula, but "economic injury is one of its paradigmatic forms." *Id.*

To properly plead antitrust standing, the plaintiff must show "more than injury causally linked to an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Perhaps most importantly, the injury must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* Other factors a court should consider when determining antitrust standing include (1) "the causal connection between the antitrust violation and the harm to the plaintiff and the intent by

5

the defendant to cause that harm"; (2) "the directness of the injury"; (3) "the existence of more direct victims of the alleged antitrust violations"; and (4) "the potential for duplicative recovery or complex apportionment of damages." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165 (3d Cir. 1993) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983)).

## B.  STANDING

SHS brings its claims under three separate statutes, all of which prohibit anticompetitive conduct. Section 1 of the Sherman Act prohibits "(e)very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Section 2 of the Sherman Act makes it a felony for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." *Id.* § 2. Finally, § 3 of the Clayton Act makes it unlawful for any person "to lease or make a sale or contract for sale of goods . . . or fix a price charged . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessor or seller, where the effect of such . . . condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." *Id.* § 14. Section 15 of the Sherman Act provides a private right of action to any person injured in his business or property by reason of any anything forbidden in the antitrust laws. *See id.* § 15.

Defendants assert SHS has not established either Article III or antitrust standing, and therefore all of SHS's claims must be dismissed. Defendants argue SHS has not suffered an injury-in-fact because SHS was not subject to Defendants' challenged contract provisions, and does not claim it was prevented from buying products from Defendants' competitors because of

the discount.[5] Defendants assert SHS has not alleged a causal connection between Defendants' supposedly illegal conduct and SHS's injury. Defendants also argue SE remains a competitor that offers lower prices and there are other competitive full-line distributers; therefore, Defendants cannot possibly charge higher, supracompetitive prices. Lastly, Defendants contend even if the Court finds SHS has suffered an injury, it is not the type of injury antitrust laws were designed to protect because SHS does not claim it was forced to buy products from Defendants or that Defendants penalized it for buying from a competitor.

The Court finds SHS's allegations of antitrust injury are sufficiently specific and plausible to establish both Article III and antitrust standing. SHS's injury consists of "paying higher prices to purchase distribution services than it would have paid absent Defendants' conduct." Am. Compl. ¶¶ 115, 122. Because SE was allegedly foreclosed from a significant portion of the suture and endo distribution services market, all of Defendants' customers—whether or not their own contracts provided for such penalties—paid more for sutures and endo distribution services than they would have paid in a market featuring vibrant competition from SE. It is plausible that SE is less able to compete because it has been prevented from growing and has less of an incentive to compete because Defendants have blocked a significant portion of the market. There is no dispute SHS is a purchaser in the sutures and endo distribution services market, so any price increase is a sufficiently direct injury to SHS, and the allegations in SHS's Amended Complaint, if proven, support at least one theory of causation which could entitle SHS to relief.

Additionally, contrary to Defendants' argument, SHS does not claim that SE currently offers lower distribution prices. Rather, SHS alleges that until 2008, SE could offer acute care

---

[5] At oral argument, SHS admitted it is a customer of Defendants but was never part of a contract that imposed the discounts at issue in this case. *See* Oral Arg. Tr. 42, Mar. 20, 2014.

providers superior service, lower distribution prices, faster and more efficient delivery, and a more comprehensive product line. Am. Compl. ¶ 32. SHS alleges, however, the Defendants' "scheme resulted in substantial foreclosure and reduced [SE's] market share." Am. Compl. ¶ 36. It is plausible that had the Defendants' conduct not reduced SE's market power, the prices SHS paid for sutures and endo distribution services would have decreased to the point where they were less than the price SHS actually paid for sutures and endo distribution services from Defendants, even after any discounts provided by the Defendants. *See Bradburn Parent/Teacher Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*, No. 02-7676, 2000 WL 34003597, at *4 (E.D. Pa. July 25, 2003) (allowing consumer class claims against a transparent tape retailer to continue because defendant's bundled prices, although lower than other competitors' prices due to a discount program, were still plausibly higher than the prices that would have existed without anticompetitive conduct). In addition, it is not dispositive that SE remains in the market as a competitor because, as the Third Circuit has repeatedly stated, to establish an antitrust violation, "it is not necessary that all competition be removed from the market. The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *United States v. Dentsply Int'l, Inc*., 399 F.3d 181, 191 (3d Cir. 2005).

Lastly, because SHS alleges Defendants' conduct results in overcharges to all customers, standing is not limited to only the acute care providers that were themselves subject to anticompetitive contracts. A direct purchaser need not allege it was a party to an exclusionary contract; it is only necessary that the alleged injury results from the anticompetitive outcomes of the alleged conduct. *See SigmaPharm, Inc. v. Mut. Pharm. Co., Inc.*, 772 F. Supp. 2d 660, 672 (E.D. Pa. 2011), *aff'd*, 454 F. App'x 64 (3d Cir. 2011). Because of the reduced competition and

the restrictions on the ability of competitors to operate in a market affected by antitrust violations, both consumers and competitors in a restrained market satisfy the standard for antitrust injury. *See id.*; *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010); *see also Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995) ("When the plaintiff's injury is linked to the injury inflicted upon the market, such as when *consumers* pay higher prices because of a market monopoly or when a competitor is forced out of the market, the compensation of the injured party promotes the designated purpose of the antitrust law—the preservation of competition." (emphasis added)); *Bradburn Parent/Teacher Stores, Inc. v. 3M*, No. 02-7676, 2004 WL 1842987, *7 (E.D. Pa. Aug. 18, 2004) (certifying class in which plaintiff consumer contended that every member of the proposed class paid too much for defendant retailer's product, regardless of whether they received any bundled rebates from defendant). SHS has adequately pleaded that Defendants' scheme injures all direct purchasers, regardless of whether they were subject to the contractual restraints, because the aggregate effect of the discount program is that Defendants can charge higher prices than would be possible under competitive conditions. Paying higher prices is the quintessential form of antirust injury.

## C.  RULE 12(b)(6) CHALLENGES

Defendants also argue SHS's Amended Complaint should be dismissed because SHS has failed to allege a plausible claim for a violation of either the Sherman Act or the Clayton Act. As to Counts Two,[6] Five,[7] and Six[8] of the Amended Complaint, the Court disagrees and finds SHS's

---

[6] In Count Two, SHS alleges a bundling claim pursuant to § 1 of the Sherman Act. Bundling is the practice of offering, for a single price, two or more goods or services that could be sold separately, and a bundled discount occurs when a firm sells the bundle for a lower price than it charges for the goods or services purchased individually. *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008); s*ee also LePage's Inc. v. 3M*, 324 F.3d 141, 154 (3d Cir. 2003) (en banc). Although bundled discounts generally benefit buyers by allowing them to get more for less, it is possible "for a firm to use a bundled discount to exclude an

equally or more efficient competitor and thereby reduce consumer welfare in the long run." *Cascade Health Solutions*, 515 F.3d at 896 (citations omitted). A competitor who sells only a part of the bundle—in this case sutures and endo products—might not be able to match profitably the price created by the bundled discount. *See id.*

SHS alleges Defendants unlawfully bundle sutures and endo distribution services with other med-surg distribution services. Customers wishing to purchase med-surg products other than sutures and endo products from the Defendants are forced to pay an enhanced distribution fee, and in order to compete effectively, Defendants' competitors would have to sell suture and endo distribution services at a loss. SHS asserts Defendants have no procompetitive reason for engaging in such actions, and these actions have produced anticompetitive effects, including artificially inflating prices for sutures and endo distribution services for all consumers. Because SHS has alleged facts sufficient to support its claim that Defendants have violated § 1 of the Sherman Act by bundling, the Court will deny the motion to dismiss as to Count Two.

[7] In Count Five, SHS alleges Defendants have participated in exclusive dealing in violation of § 3 of the Clayton Act. SHS claims Defendants sell med-surg distribution services based on the condition the purchaser will not purchase sutures and endo distribution services from Defendants' competitors, and this exclusive dealing has foreclosed competitors from the suture and endo products distribution services market. SHS also alleges Defendants' contracts are difficult to terminate, and thus exist for long terms.

"An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) (citation omitted). Oftentimes exclusive dealing arrangements are entered into for procompetitive reasons; therefore, the legality of such agreements is judged under the rule of reason and depends on whether the arrangement "will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition." *Id.* at 271; *see also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-29 (1961). To be unlawful, the arrangement must "substantially lessen competition, rather than merely disadvantage rivals." *ZF Meritor*, 696 F.3d at 271.

It is plausible Defendants' contracts qualify as unlawful exclusive dealing, even if the exclusive terms are not explicitly stated in the contracts themselves. First, O&M and Cardinal allegedly have 39% and 33% of the market for sutures and endo distribution services, respectively. SHS asserts Defendants have entered into the challenged contracts "with at least a majority of acute care providers," or, at the very least, half of their customers, which could be 19.5% and 16.5% of the relevant market. Am. Compl. ¶ 54; Oral Arg. Tr. 67-68, Mar. 20, 2014. Thus, the potential degree to which Defendants' actions foreclose competitors from the suture and endo distribution services market is significant and may violate the Clayton Act. *See Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1252 (3d Cir. 1975) (finding that in light of the fact the defendant was the largest hotel-motel group in the country, an agreement which foreclosed defendant's competitors from 14.7% of the market "may well offend the limitations which the Clayton Act places on exclusive contracts"). In addition, a number of factors are relevant to the determination whether an exclusive dealing arrangement forecloses a substantial part of the market; it is not simply a qualitative analysis of market power. *See ZF Meritor*, 696 F.3d at 271. For example, exclusivity arrangements need not be expressly stated in a contract; instead, courts must "ascertain the relationship between the parties and the effect of the

agreement 'in the real world.'" *Id.* at 270. Therefore, even though Defendants' contracts might not explicitly exclude customers from buying supplies from competitors, the real world effect may be to do just that. Further, the Clayton Act is not limited to contracts that completely exclude the purchase of a competitor's goods. *See id.* at 283. Given these factors, the Court cannot decide at this stage that the contracts at issue do not involve exclusive dealing, and this claim will not be dismissed.

[8] In Count Six, SHS alleges Defendants have tied med-surg distribution services other than sutures and endo distribution services (tying products) to the purchase of sutures and endo distribution services (tied products), in violation of § 1 of the Sherman Act. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or agrees that he will not purchase that product from any other supplier." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958). When the seller maintains a monopolistic position in the market for the tying product and if a substantial volume of commerce in the tied product is restrained, a tying arrangement is per se illegal. *See Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 608-09 (1953). If the defendant's lack of market power in the tying product prevents a plaintiff from establishing per se illegality of a tying arrangement, the defendant's conduct may still be unlawful under a rule of reason analysis. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 17-18 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221-22 (3d Cir. 2011). The Sherman Act does not prohibit "tying," it prohibits "contracts . . . in restraint of trade." *Jefferson Parish*, 466 U.S. at 22 n.34. Thus, "[t]he legality of petitioners' conduct depends on its competitive consequences, not whether it can be labeled 'tying.'" *Id.*

In this case, SHS has not alleged Defendants' market share in the market for med-surg distribution services excluding sutures and endo distribution services, stating only that each Defendant possess "appreciable power" in this market. Am. Compl. ¶ 138. Assuming the Defendants possess similar shares in that market as they do in the med-surg distribution services market generally (39% for O&M and 33% for Cardinal), then Defendants individually do not have the requisite market power to render the discount program per se illegal. However, SHS can still advance its claim under a rule of reason standard by demonstrating an actual adverse effect on competition in the sutures and endo distribution services market and an injury cognizable by the antitrust laws. *See Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 482 (3d Cir. 1992). SHS has properly pled such an adverse effect because it claims that the Defendants' discount program has raised prices for all med-surg products. *See, e.g.*, Am Compl. ¶¶ 90, 94.

Defendants point out that SHS is free to buy from other competitors, and if the buyer in an arrangement is "free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." *N. Pac. Ry. Co.*, 356 U.S. at 6; *see also Warren Gen. Hosp. v. Amgen Inc.*, No. 09-4935, 2010 WL 2326254, at *7 (D.N.J. June 7, 2010), *aff'd*, 643 F.3d 77 (3d Cir. 2011). However, an illegal tying arrangement can exist if purchasing the items together is the "only viable economic option." *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992) (quoting *Nobel Scientific Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1324 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987)); *see also Compuware Corp. v. Int'l Bus. Machines Corp.*, 366 F. Supp. 2d 475, 480 (E.D. Mich.

allegations are sufficient at the pleading stage. As to Counts One, Three, and Four, the Court agrees SHS has failed to state a plausible claim for relief. The Court will therefore grant Defendants' motion as to these three Counts for the reasons set forth below.

1.  **Counts Three and Four: Conspiracy**[9]

In Counts Three and Four, SHS alleges conspiracy to restrain trade and conspiracy to monopolize in violation of §§ 1 and 2 of the Sherman Act respectively. Because the Court finds SHS has not adequately alleged the existence of an agreement among the Defendants, these Counts will be dismissed.

Section 1 of the Sherman Act applies only to contracts, combinations, and conspiracies; hence claims pursuant to § 1 always require the existence of an agreement. *See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254 (3d Cir. 2010). Claims pursuant to § 2 do not require an agreement except where, as here, the specific charge is conspiracy to monopolize. *Id.*; *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767

---

2005). In the absence of a formal agreement, a plaintiff can still establish a tie-in was involved by "proof that purchase of one product, the tied product, was not voluntary, i.e., by proof of coercion." *Ungar v. Dunkin' Donuts of Am., Inc.*, 531 F.2d 1211, 1224 (3d Cir. 1976). Here, SHS alleges purchasers have been coerced into buying products they might have preferred to purchase elsewhere because Defendants' bundles are structured and priced so customers have no sound economic alternative but to accept the offer. Am. Compl. ¶ 58. The Court finds these circumstances could plausibly amount to coercion.

The Court has serious doubts about the viability of SHS's tying claim in light of the fact the arrangement is not per se illegal given the Defendants' market power and the fact consumers can purchase the tying and tied products separately. This issue, however, is better addressed at the summary judgment stage.

[9] The Court will address Counts Three and Four of the Amended Complaint involving allegations of conspiracy or concerted action before turning to the substantive monopolization claim, which relies in part on the sufficiency of the conspiracy allegations.

n.13 (1984). Thus, the viability of SHS's claims in Counts Three and Four turn on whether it has adequately alleged an agreement among the Defendants.[10]

An agreement exists when there is "some form of concerted action [defined as] unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme." *W. Penn Allegheny Health Sys.*, 627 F.3d at 99 (citation and internal quotation marks omitted). In order to avoid deterring innocent conduct that enhances competition, alleged facts supporting a conspiracy claim "must tend to rule out the possibility that the defendants were acting independently." *Twombly*, 550 U.S. at 554; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010). In a highly concentrated market, "'any single firm's price and output decisions will have a noticeable impact on the market and on its rivals,' such that when any firm in that market 'is deciding on a course of action, any rational decision must take into account the anticipated reaction of the other firms.'" *Ins. Brokerage*, 618 F.3d at 321 n.19 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 359 (3d Cir. 2004)). The result "is that firms in a concentrated market may maintain their prices at supracompetitive levels, or even raise them to those levels, without engaging in any overt concerted action." *Flat Glass*, 385 F.3d at 359.

Although parallel conduct by competitors in a particular market is consistent with the existence of an agreement, it is "just as much in line with a wide swath of rational and

---

[10] Specifically, to prevail on a § 1 conspiracy claim, the plaintiff must allege "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) . . . the concerted actions were illegal; and (4) [the plaintiff] was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005); *see also Howard Hess*, 602 F.3d at 253. To prevail on a § 2 conspiracy claim, a plaintiff must establish "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Howard Hess*, 602 F.3d at 253 (citing *Am. Tobacco Co. v. United States*, 328 U.S. 781, 788, 809 (1946)) (second citation omitted).

competitive business strategy unilaterally prompted by common perceptions of the market," and is thus not dispositive of an agreement. *Ins. Brokerage*, 618 F.3d at 321. Therefore, in addition to allegations of parallel conduct, a plaintiff must allege facts that, if true, would establish at least one "plus factor."[11] These factors include: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011) (quoting *Ins. Brokerage*, 618 F.3d at 321-22).

The first factor, the defendant's motive to enter into a price fixing conspiracy, means allegations that "the industry is conducive to oligopolistic price fixing" or "the structure of the market was such as to make secret price fixing feasible." *Flat Glass*, 385 F.3d at 360 (citation omitted); *see id.* at 361 (reversing the grant of summary judgment and finding plaintiffs demonstrated defendant had a motive to enter a price fixing conspiracy given the conditions of the flat glass market including the fact there was only a handful of sellers, there was no fringe market of smaller firms, the industry had high fixed costs, flat glass was a standardized product, and there was a decline in demand but an increase in supply for flat glass during the relevant time); *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 54 (E.D. Pa. 2007) (describing a homogenous commodity sold in a concentrated market with high barriers to entry and "huge" fixed costs of production as "textbook conditions for illegal collusion"). The second factor, evidence that the defendant acted contrary to its interests, "means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market." *Flat Glass*,

---

[11] *See Ins. Brokerage*, 618 F.3d at 322 (explaining that "*Twombly* aligns the pleading standard with the summary judgment standard in at least one important way: Plaintiffs relying on circumstantial evidence of an agreement must make a showing at both stages (with well-pled allegations and evidence of record, respectively) of something more than merely parallel behavior and something plausibly suggest[ive of] (not merely consistent with) agreement" (internal citations and quotation marks omitted)).

385 F.3d at 360-61. Courts must evaluate these first two factors with care, however, because each "may indicate simply that the defendants operate in an oligopolistic market, that is, may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism." *Ins. Brokerage*, 618 F.3d at 322. Thus, these two factors "do not alone tend to exclude the possibility of independent action," and the Court must focus primarily on the third factor, evidence implying a traditional conspiracy. *See Flat Glass*, 385 F.3d at 361. This evidence consists of "non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Ins. Brokerage*, 618 F.3d at 322 (citation and internal quotation marks omitted).

SHS asserts it has properly pleaded all three plus factors. According to SHS, it pleaded motive to enter into a conspiracy because the Amended Complaint alleges products were offered in a concentrated market with high barriers to entry and large fixed costs of production. Second, Defendants acted contrary to their self-interests, otherwise each would have responded to the other's bundling practices by offering customers an alternative purchasing option without a restrictive bundling condition, in order to take market share from its rival. Lastly, SHS alleges Defendants have acted as coconspirators because at least since 2007, they have been afforded numerous opportunities to collude at annual med-surg conferences.

The Court finds these allegations are insufficient to show the Defendants formed an agreement. First, as to the Defendants' motive, even assuming the sutures and endo distribution services market is susceptible to collusion given high barriers to entry and large fixed costs of production, this factor alone does not support SHS's conspiracy claim. SHS's allegation that

15

Defendants are acting contrary to their interests fail because Defendants' conduct could easily be explained by each one independently choosing a similar strategy—requiring loyalty for discounts. SHS has not sufficiently alleged that an alternative strategy (offering customers an alternative purchasing option without a restrictive bundling condition) was "potentially any more lucrative than other opportunities being pursued by the [Defendants] during the same period." *Twombly*, 550 U.S. at 568. While it is logical that each Defendant might be economically motivated to remove the "penalty" to gain the other's business, the fact they did not does not give rise to a plausible inference of an agreement among the Defendants themselves in light of the Defendants' other motivations. *See Twombly*, 550 U.S. at 566 (noting the logic of the complaint's allegation of an agreement but finding it insufficient because the Defendants had independent reasons to act the way they did).

As to the third, most telling factor, SHS states only in a conclusory fashion that Defendants conspired to allocate markets or employ identical contractual terms. The fact that the Defendants are members of a trade association that hosts annual conferences does not transform Defendants' parallel conduct into a conspiracy. Although SHS alleges that "[r]epresentatives from Cardinal and O&M routinely attend HIDA's Med-Surg Conferences," Am. Compl. ¶ 71, SHS does not identify any particular conference that both Defendants attended. Rather, SHS merely asserts these conferences "provide opportunities for Defendants to collude." Am. Compl. ¶ 70.[12] While SHS need not plead direct evidence of a conspiracy such as specific "meetings, conversations, or exchanged documents," it does need to allege either indications of a conspiracy

---

[12] SHS does allege that five representatives from Cardinal spoke at a 2012 conference and "[b]oth companies are slated to attend the 2013 conference in Washington, D.C." Am. Compl. ¶ 71. The fact that one of the Defendants' representatives spoke at a conference and representatives from both Defendants *might* have attended a conference in 2013 does not render it plausible the Defendants "got together and exchanged assurances of common action." *Flat Glass*, 385 F.3d at 361.

or proof Defendants "exchanged assurances of common action or otherwise adopted a common plan." *Flat Glass*, 385 F.3d at 361 (citation and internal quotation marks omitted); *see In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 722 (E.D. Pa. 2011) ("Certainly, pertinent legal authority is clear that participation in a trade group association and/or attending trade group meetings, even those meetings where key facets of the conspiracy allegedly were adopted or advanced, are not enough on their own to give rise to the inference of *agreement* to the conspiracy."); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009) ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [the defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior."). In sum, SHS does no more than describe "merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

Because SHS has failed to allege any facts plausibly suggesting a unity of purpose, a common design and understanding, or a meeting of the minds between and among the Defendants, Counts Three and Four will be dismissed.

### 2. Count One: Monopoly

In Count One, SHS alleges unlawful monopolization and, in the alternative, attempted monopolization in the sutures and endo distribution market. Because SHS has failed to sufficiently plead the possession of monopoly power by either Defendant or that the Defendants have a dangerous probability of achieving monopoly power, this Count will be dismissed.

To state a claim for monopolization, the plaintiff must allege facts supporting an inference of "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom Corp. v.*

*Qualcomm Inc.*, 501 F.3d 297, 306-07 (3d Cir. 2007) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). To state a claim for attempted monopolization, the plaintiff must plead "(1) that the defendant has a specific intent to monopolize, and (2) that the defendant has engaged in anticompetitive conduct that, taken as a whole, creates (3) a dangerous probability of achieving monopoly power." *W. Penn Allegheny Health Sys., Inc.*, 627 F.3d at 108 (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

Typically, monopoly power is "inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001)). "Plaintiffs relying on market share as a proxy for monopoly power must plead and produce evidence of a relevant product market, of the alleged monopolist's dominant share of that market, and of high barriers to entry." *Id.* Entry barriers are factors that prevent new rivals from timely responding to an increase in price above the competitive level. *Microsoft Corp.*, 253 F.3d at 51. For an attempted monopolization claim, the level of market power required is generally less than that required to support a finding of actual monopolization. *See In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 700 (E.D. Pa. 2007). To determine whether a defendant has a dangerous probability of achieving monopoly power, the court should consider factors other than the size of the defendant's market share, including "the strength of competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand." *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992).

The relevant market in this case is the sutures and endo distribution services market. SHS alleges O&M has a market share of 39% and Cardinal has a market share of 33%, for a total of

72%.[13] SHS asserts that because it plausibly alleges a conspiracy to monopolize, the Defendants' market shares should be combined. *See, e.g.*, *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("The aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired to monopolize." (citing *United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1122 (5th Cir. 1984)). While it is true that once aggregated, Defendants' collective market share is sufficient to impose § 2 liability, SHS has failed to state a claim for conspiracy. Therefore, the Court will not consider the aggregate market power of the Defendants in deciding whether SHS has adequately pleaded claims under § 2 of the Sherman Act.[14]

Most lower courts across the country have held that a 70% to 80% market share is necessary to indicate monopoly power. *See Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1226 & n.6 (D. Kan. 2013) (collecting cases). The Third Circuit has found that a "significantly larger market share than 55 percent has been required to demonstrate *prima facie* monopoly power," but a less than predominant share of the market combined with other relevant factors may suffice to demonstrate monopoly power. *Fineman v. Armstrong World*

---

[13] In Count One, SHS alleges unlawful monopolization or attempted monopolization in the sutures and endo distribution services market. As explained above, in the Amended Complaint, SHS provided the Court with Defendants' market shares of the overall med-surg distribution services market including sutures and endo distribution services (39% for O&M and 33% for Cardinal), but also asserts "[u]pon information and belief, Defendants possess similar shares in the sutures and endo distribution services market with respect to acute care providers." Am Compl. ¶ 17.

[14] SHS admitted at oral argument that if the Court did not accept a shared monopoly theory and the Court did not find a conspiracy (which would allow for aggregation of the shares), then "we wouldn't have a § 2 claim at all." Oral Arg. Tr. 61, Mar. 20, 2014. As the District of Kansas explained in dismissing SE's § 2 claims against these same Defendants, most courts have rejected a shared or joint monopoly argument when analyzing § 2 claims because such claims contradict the basic concept that a monopoly is the domination of a market by a single firm. *See Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1227 (D. Kan. 2013). This Court similarly rejects a shared or joint monopoly argument.

*Indus., Inc.*, 980 F.2d 171, 202 (3d Cir. 1992). These other relevant factors include "the size and strength of competing firms; freedom of entry into the field; pricing trends and practices in the industry; the ability of consumers to substitute comparable goods or services from outside the market; and consumer demand." *Id.*; *see also Dentsply Int'l*, 399 F.3d at 187.

O&M and Cardinal's individual market shares of 39% and 33% are not sufficient to indicate monopoly power. Further, SHS has not sufficiently pleaded any relevant factors other than conclusory assertions regarding high barriers to entry.[15] In terms of attempted monopolization, SHS has not alleged factors indicating a dangerous probability of success of monopolizing the market. It asserts only that each Defendant has sufficient market power to create this possibility. Am. Compl. ¶ 113. It has not set forth any allegations regarding strength of competition, probable development of the industry, or the elasticity of consumer demand. Given the failure of its conspiracy allegations, SHS has not adequately pleaded its monopoly claims, and Count One will be dismissed.

An appropriate order follows.

BY THE COURT:


/s/ Juan R. Sánchez
Juan R. Sánchez, J.

---

[15] SHS describes these barriers to entry in the distribution services field as "high fixed costs, high risk of failure in the business development process, and difficult regulatory hurdles," along with the fact that "[p]roviding Med-Surg distribution services requires substantial investment in a distribution network and regulatory compliance." Am. Compl. ¶ 43. SHS also asserts Defendants' discount program creates a barrier to entry. *Id.* ¶ 93.